IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-HC-2257-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | PETITIONER'S PROPOSED FINDINGS |
| | ) | OF FACT AND CONCLUSIONS OF LAW |
| v. | ) | |
| | ) | |
| BLAKE CHARBONEAU, | ) | |
| | ) | |
| Respondent. | ) | |

**INTRODUCTION**

The United States ("Petitioner"), seeks to civilly commit Blake Charboneau ("Respondent"), as a "sexually dangerous person" under Section 302(4) of the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), as codified at 18 U.S.C. §§ 4247-4248. To civilly commit Respondent under the Adam Walsh Act Petitioner must prove by clear and convincing evidence that Respondent is "sexually dangerous."

A person is sexually dangerous if he "has engaged or attempted to engage in sexually violent conduct or child molestation and . . . is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). To determine that a person is sexually dangerous to others, a court must find that he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child

1

molestation if released." Id. § 4247(a)(6). Petitioner proposes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### A. **Procedural History**

On July 24, 2015, Bureau of Prisons ("BOP") Dr. Heather Ross, a forensic psychologist, prepared a precertification report for the Sex Offender Certification Review Branch. (Ross Report at Bates 527 [Ex. 5]).

On December 3, 2015, Petitioner, pursuant to 18 U.S.C. § 4248, filed a certification alleging Respondent is a sexually dangerous person. (Petition [DE 1]).

On December 8, 2015, The Court appointed Dr. Christopher North ("Dr. North") as the court-selected mental health examiner. (Order [DE 6]).

On January 4, 2016, the Court appointed Dr. Joseph J. Plaud ("Dr. Plaud") as an additional mental health examiner selected by Respondent. (Order [DE 9]).

Petitioner retained forensic psychologist Dr. Gary Zinik ("Dr. Zinik") as Petitioner's expert forensic psychologist and moved the Court for an order allowing Dr. Zinik to conduct a forensic examination of Respondent, which the Court allowed. (Order [DE 16]).

2

B.   **Personal and Family Data**

Respondent is a 57 years old Native American member of the Turtle Mountain band of the Chippewa Tribe. (Charboneau Dep. 7:02-9:01 [Ex. 21]; North Report at Bates 1621 [Ex. 3]). Respondent was born in Devil's Lake, North Dakota, and resided there until he was 15 years old before moving to Fort Totten, North Dakota. (Charboneau Dep. 9:02-10:20 [Ex. 21]; North Report at Bates 1621 [Ex. 3]). Respondent is the 5th of 12 children. (Ross Report at Bates 530 [Ex. 5]). Respondent has 5 sisters and 7 brothers. (Charboneau Dep. 10:09-13:17 [Ex. 21]). Respondent's parents are no longer married and Respondent's mother previously alleged that Respondent's father may have sexually abused Respondent and his siblings. (Ross Report at Bates 530-31 [Ex. 5]). Respondent has had no contact with his family. (Charboneau Dep. 10:09-10:11 [Ex. 21]).

Respondent is single and has fathered two daughters with Emma Bull Bear (deceased). (Ross Report at Bates 531 [Ex. 5]). The children reside with Respondent's mother. (Ross Report at Bates 531 [Ex. 5]).

C.   **Educational Background**

Respondent withdrew from school while still in the ninth grade. (Ross Report at 5 [Ex. 5]). In 1977, Respondent attended Kicking Horse Jobs Corps in Montana briefly but was discharged from the course after staff observed him sniffing gas and later

3

committed a superficial suicidal gesture. (Ross Report at 5 [Ex. 5]).

D. **Employment History**

Respondent has worked sporadically during his lifetime. Records indicate Respondent worked unspecified temporary jobs. (Ross Report at Bates 531 Bates 531 [Ex. 5]). Prior to Respondent's most recent federal incarceration Respondent worked as a dishwasher. (Ross Report at 5 [Ex. 5]).

E. **Respondent's Criminal History**

Respondent has had frequent contact with the criminal justice system. According to records from the North Dakota State Hospital, tribal law enforcement officers first arrested Respondent when he 13 years old for repeatedly running away from home and being prone to fighting. (Ross Report at Bates 534-35 [Ex. 5]). Since 1978, law enforcement officers have arrested or taken Respondent into custody approximately 36 times for various crimes ranging from disorderly conduct, public intoxication, assault, larceny, and liquor violations to sexual crimes. (Ross Report at Bates 534-38 [Ex. 5]). More than 20 of Respondent's offenses are related to Respondent's use of alcohol. (Plaud Report at Resp. 6 [Resp't Ex. 2]).

On June 30, 1982, Respondent, then 22 years old, pleaded guilty to his first sexual crime. (Ross Report at Bates 535 [Ex. 3]). On April 2, 1982, Respondent attended a party where the

4

victim, his 23-year-old female cousin, was also present. (Ross Report at Bates 536 [Ex. 5]). The victim left the party at approximately 1:00 a.m. on April 3rd and returned to an apartment of a friend that she was house sitting. (Ross Report at Bates 536 [Ex. 5]). Respondent, then intoxicated, followed the victim. After the victim went to sleep, Respondent pushed his way inside the apartment and demanded cigarettes. Respondent grabbed her, tore off her nightgown and panties, slapped her across her face and with a closed fist hit her legs and threatened to kill her if she did not submit or if she told anyone. (Charboneau Dep. 59:18-60:09 [Ex. 21]; Ross Report at Bates 536 [Ex. 5]). Respondent then raped her until two friends heard her screams and entered the apartment and found the victim and Respondent in the bedroom. (Ross Report at Bates 537-38 [Ex. 5]). A rescuer asked Respondent what happened and Respondent laughed, commented incoherently, and then left the apartment. (North Report at Bates 1615 [Ex. 3]).

Fort Totten police officers arrested Respondent the next day for fighting and officers questioned him about the sexual assault. (Plaud Report at Resp. 7 [Resp't Ex. 2]). Respondent told officers that he could not remember what occurred because he had suffered an alcoholic blackout. (Plaud Report at Resp. 7 [Resp't Ex. 2]). Fort Totten police charged Respondent with rape and assault and as part of a negotiated plea deal Respondent pleaded guilty to the assault charge and the court sentenced him to 18 months'

5

imprisonment. (Charboneau Dep. 59:20-59:21 [Ex. 21]; Plaud Report at Resp. Bates 536 6 [Resp't Ex. 2]).

On August 11, 1987, Respondent committed his second sexual offense. According to the PSR, Respondent entered a woman's home and forcibly removed her clothing and attempted to rape her on the kitchen floor when the victim's husband came home and stopped him. (Ross Report at 10 [Ex. 5]).

When questioned about this incident Respondent has provided varying accounts of what happened. Respondent told Dr. North on January 19, 2016, that he does not remember anything about the 1987 arrest for sexually assaulting the woman who lived near his brother other than "they [unspecified] kicked the shit out of me and she never pressed charges." (North Report at Bates 1632 [Ex. 3]). On February 9, 2016, Respondent denied committing the offense during his clinical interview with Dr. Plaud. (Plaud Report at Resp. Bates is Resp. 7 [Resp't Ex. 2]).

On February 18, 2016, Respondent told Dr. Zinik that he had no memory of the actual incident but when Dr. Zinik reminded Respondent of the victim's name Respondent stated that he remembered meeting the victim the night before but that on the date of the offense he was drinking with his brother and only recalls that he woke up bleeding in a jail cell after being beaten up. (Zinik Report at 1660 [Ex. 7]). Similarly, when deposed Respondent admitted that he forcibly entered a woman's home but

6

testified that he could not remember unbuckling his pants, forcing the woman to remove her clothing, attempting to rape the woman on the kitchen floor, or recall the woman's husband arriving in time to stop him. (Charboneau Dep [Ex. 21] 60:10-60:22; 61:12-61:17). Respondent further testified that he could not recall the events because he was drinking at the time. (Charboneau Dep. [Ex. 21] 60:23-60:25).

Respondent's third sexual offense occurred on July 31, 1988, after a family picnic. While drunk Respondent took his 10-year-old daughter to an area where an onlooker's view would be obscured by bushes and raped his 10-year-old daughter. (Ross Report at 11 [Ex. 5]). However, Respondent's 5-year-old nephew was present during the rape. Respondent's daughter reported that Respondent slapped and punched her in the face blooding her nose during the sexual assault. (Ross Report at Bates 537[Ex. 5]. Respondent halted the sexual assault when his sister, "Roberta," honked the horn of her automobile as she was looking for her son and niece. (Ross Report Bates 537 [Ex. 5]). Respondent's daughter ran to the car. (Ross Report at Bates 537 [Ex. 5]). Roberta later told law enforcement officers that she noticed her niece has a bloodied nose and that her clothing was disheveled. (Ross Report at Bates 537 [Ex. 5]). Roberta also reported to law enforcement officers that she saw Respondent buttoning his pants as he emerged from the bushes. (Ross Report at Bates 537 [Ex. 5]). A Physical

7

examination of the victim revealed "pubescent genitalia, with what appeared to be sperm in the region of the labia, and a ruptured hymen which was bleeding slightly." (Ross Report at Bates 537 [Ex. 5]).

On October 27, 1988, a jury found Respondent, then 28 years old, guilty of aggravated sexual abuse by force. (Ross Report at 10 [Ex. 5]). The court committed Respondent to the custody of the Attorney General for an examination pursuant to 18 U.S.C. § 4244 prior to sentencing. (Ross Report at Bates 536 [Ex. 5]). On December 5, 539, the Warden of the Federal Medical Facility in Rochester, Minnesota, certified that Respondent had recovered to the extent that he no longer required psychiatric hospitalization and could return for sentencing. (Ross Report at Bates 536 [Ex. 5]).

Respondent argued at sentencing that he suffered from a diminished mental capacity and sought a downward departure from established guideline range. (Ross Report at Bates 537 [Ex. 5]). Although the court agreed that medical records reflected a diminished mental capacity, the court denied the motion based on the violent nature of the crime and Respondent's voluntary use of intoxicants. (Ross Report at Bates 537 [Ex. 5]). It was at the proceeding that Respondent first admitted that he raped his daughter. (Ross Report at Bates 537 [Ex. 5]).

On January 4, 1990, the court sentenced Respondent to under 60 months' imprisonment and recommended that BOP place Respondent at a federal medical Center. (Ross Report at Bates 537 [Ex. 5]). The court further ordered that Respondent serve a five-year term of supervised release, barred Respondent from using alcohol, narcotic drugs, or any other controlled substance without a prescription by licensed medical practitioner and required drug testing to verify Respondent's compliance.(Ross Report at Bates 537 [Ex. 5]; Judgment at 3 [Ex. 14]).

On October 11, 2000, Respondent was released from BOP custody to the District of North Dakota and began his term of supervised release. (Ross Report at Bates 538 [Ex. 5]; Supplemental Presentence/Adjustment Report Supervised Release Violation at Bates 9 [Ex. 10]). The court later modified Respondent's conditions of supervision to include sex offender registry, no contact with minors, no residing with minors, no attempt to communicate with or traveling near the victims of his offense, no loitering near areas where children congregate, no dating or socializing with anyone with children, and participation in sex offender treatment including submitting to the administration of a polygraph. (Ross Report at Bates 538 [Ex. 5]).

On May 1, 2001, Respondent's supervision was transferred to Rapid City, South Dakota, for his placement in Community Alternatives of the Black Hills, a community corrections center,

and to provide him access to mental health and sex offender treatment. (Ross Report at 536 [Ex. 5]; Plaud Report at 8 [Resp't Ex. 2]).

Respondent committed his fourth sexual offense in 2003. The victim was his adult niece.[1] (Ross Report at 12 [Ex. 5]; Transcript (Tr.), State of South Dakota v. Charboneau, File No. 03-2441, [Ex. 13]). On July 11, 2003, at 4:00 p.m., Respondent was at the victim's apartment. (Tr. at Bates 178 [Ex. 13]). the victim's girlfriend, S.V., was also present. (Tr. at Bates 178 [Ex. 13]).

Respondent and the victim drank alcohol, Black Velvet, and Coke. (Plaud Report at 8 [Resp't Ex. 2]; Tr. at Bates 178-79 [Ex. 13]). S.V. did not drink. (Tr. at Bates 179 [Ex. 13]). Respondent and the victim consumed alcohol from 4:00 p.m., until 8:00 p.m., during which a second friend of the victim's, T.T., visited the victim. (Tr. at Bates 179-80 [Ex. 13]). T.T. left at 9:00 p.m., at which time the victim told Respondent that she going to sleep. (Tr. at Bates 180-81 [Ex. 13]). Respondent sat on a footstool and continued to drink as the victim and S.V. lay down to sleep on a pull out bed located in the living room. (Tr. at Bates 180-81 [Ex. 13]).

---

[1] During Respondent's deposition the undersigned mistakenly referred to the victim as Respondent's cousin. (Charboneau Dep. 63:09-63:21 [Ex. 21]). Respondent did not correct that impression.

Peltier awoke at 11:00 p.m., and discovered Respondent had removed her shorts and panties and was performing cunnilingus on her. (Plaud Report at Resp. 8 [Resp't Ex. 2]). the victim told Respondent to stop, got up, grabbed her shorts and then went to the bathroom. (Tr. at Bates 181-82 [Ex. 13]). Respondent pursued the victim into the bathroom where he pushed her and asked her if she was angry. (Tr. at Bates 182 [Ex. 13]). the victim told Respondent that she was angry. (Tr. at Bates 182 [Ex. 13]). the victim tried to close the door but Respondent placed his foot inside the door and told her that he would not allow her to close the door unless she told him she was not angry with him. (Tr. at Bates 182-83 [Ex. 13]). the victim complied and Respondent allowed her to close the door. (Tr. at Bates 183 [Ex. 13]).

The victim dressed and then woke up S.V. and told her what occurred. (Tr. at Bates 183-84 [Ex. 13]). Respondent remained in the residence and continued to drink. Respondent left after 15 minutes of demands from the victim. (Tr. at Bates 184 [Ex. 13]). the victim then went back to sleep.

Respondent returned at 4:30 a.m. and awoke the victim when he reentered her apartment. The victim and Respondent smoked cigarettes. She told Respondent that she was angry at him and he asked her if she did not like men. (Plaud Report at Resp. 8 [Resp't Ex. 2]). Respondent threw the victim to the ground and pulled down her shorts and forcibly removed her panties. (Plaud Report at

11

Resp. 9 [Resp't Ex. 2]). Respondent removed his pants and attempted to rape the victim. the victim told Respondent that she would scream and Respondent threatened to punch her if she did. (Plaud Report at 9 [Resp't Ex. 2]). The victim fought Respondent off and ran to the bathroom. Respondent followed. He stopped her from closing the door.

The victim was eventually able to reason with Respondent. She asked him to give her a cigarette. Respondent then put his pants back on as the victim put on her panties. The victim returned to the living room and put her shorts back on.

Respondent and the victim went to the victim's girlfriend's apartment. Respondent stood outside. the victim and her friend then went to the sheriff's office and reported the incident. Law enforcement officers interviewed Respondent. Respondent told them that he was the victim's uncle by blood and that he knew her for about 6 months.

On July 14, 2003, a deputy state's attorney filed an information in the Seventh Judicial Circuit Court in Pennington County, South Dakota, that charged Respondent with second-degree rape and attempted second-degree rape. (Compl., State of South Dakota v. Charboneau, [Ex. 12]). The State later amended information to charge Respondent with engaging in sexual contact with a person incapable of consenting, felony. (Am. Judgment,

State of South Dakota v. Charboneau, File No. 51C03002441AO [Ex. 11]).

On December 9, 2003, the Respondent pleaded guilty but mentally ill to the charge of sexual contact with a person incapable of consenting. (Am. Judgment, State of South Dakota v. Charboneau, File No. 51C03002441AO [Ex. 11]).

On December 23, 2003, the state court sentenced Respondent to 10 years' imprisonment. (Ross Report and 11 [Ex. 5]). On January 9, 2004, the state court filed an amended judgment that stated Respondent had the pleaded guilty but mentally ill. (Ross Report at 11 [Ex. 5]).

The United States probation office filed a notice of revocation based on the new criminal conduct. On November 23, 2004, the court resentenced Respondent to a 36-month term of imprisonment, consecutive to Respondent's state conviction, and a 24-month term of supervised release to commence upon Respondent's release from imprisonment.

D. **Witnesses**

1. **Dr. Kara Holden**

Dr. Kara Holden is a BOP clinical psychologist in the Commitment Treatment Program ("CTP"). Dr. Holden is also Respondent's treatment provider. Dr. Holden testified regarding the philosophy and structure of the CTP and the four phases a detainee must complete before BOP considers the detainee's

13

release. Dr. Holden testified that Respondent is in Phase 2 of the program.

Dr. Holden testified and the records confirm that Respondent volunteered for treatment in the CTP on February 22, 2016. (Initial Treatment Plan Psychological Testing Report at Bates 1796 [Exhibit 26]). Respondent underwent a series of psychological tests. (Initial Treatment Plan Psychological Testing Report at Bates 1796-98 [Exhibit 26]). Respondent's responses on one such test, the Multiphasic Sex Inventory II ("MSI II"), demonstrated Respondent seriously minimized having sexual thoughts prior to committing the offenses, attempted to deny knowledge of the fundamental wrongness of his sexual behavior, viewed himself as a victim, and despite previous alcohol substance abuse treatment, denied that he had an alcohol abuse problem. (Initial Treatment Plan Psychological Testing Report at Bates 1798 [Exhibit 26]).

On June 13, 2016, approximately four months after entering the CTP, Respondent continued to demonstrate many of the same minimizations and rationalizations first detected in Respondent's results to questions on the MIS II. (Clinical Contact Note [Ex. 24]; Initial Treatment Plan Psychological Testing Report at Bates 1798 [Exhibit 26]).

On November 30, 2016, Dr. Holden assessed Respondent's treatment needs. (Initial Assessment [Ex. 28]). Dr. Holden determined that two of Respondent's treatment needs are substance

14

use and sexual entitlement. (Initial Assessment at Bates 1809 [Ex. 28]). Substance use pertained to Respondent's historical use and denial of his alcohol overuse and sexual entitlement pertained to Respondent's belief that Respondent felt he was owed sex from women that he believed the women came unto to or teased him. (Initial Assessment at Bates 1809 [Ex. 28]). Dr. Holden testified as to the dangerous interplay between Respondent's alcohol overuse and his feelings of sexual entitlement.

Dr. Holden also testified that over time Respondent has begun to open to her and trusts her. To foster that trust and make Respondent more comfortable communicating with her and CTP staff, Dr. Holden made Respondent an orderly in the CTP. Further, Dr. Holden testified that although Respondent has communicative challenges and has been referred to a neuropsychologist for an assessment based on his odd speech pattern, she has developed a relationship with Respondent wherein she carefully notes his responses to her questions and verifies with Respondent that she correctly stated his responses to her questions.

Dr. Holden testified that Respondent complied with her suggestion that he attend weekly alcohol anonymous meetings but Respondent still denied that he has an alcohol problem. Regarding the availability of alcohol, Dr. Holden testified that she is aware that some prisoners in Butner produce alcohol or "hooch" and when asked about her knowledge of detainees in the Maryland unit (the

15

unit that houses detainees pending civil commitment or who have been committed under the Adam Walsh Act) who have produced prison alcohol, Dr. Holden testified that she knew of just one such instance.

Dr. Holden also testified that Respondent seemed sincere in his desire to change his life. On December 9, 2016, Respondent spoke to Dr. Holden after a community meeting and disclosed for the first time that he desired to have sexual contact with his victims prior to committing the offenses and that he believed that he was sexually dangerous. (Clinical Contact Note [Ex. 27]).

### 2. Dr. Christopher North

Dr. Christopher North is a forensic psychologist. Dr. North opined in his report (North Report at Bates 1642 [Ex. 3]) and at the hearing that Respondent meets the criteria for civil commitment as a sexually dangerous person.

In forming his opinion, Dr. North reviewed the written discovery provided by Petitioner. The written discovery includes information related to Respondent's criminal history, social history, substance abuse history, and institutional reports. Dr. North also conducted a clinical interview with Respondent on January 19, 2016, and considered Respondent's range of risk on the Static-99R, an actuarial tool, and analyzed the presence of dynamic risk factors using the Hare Psychopathy Checklist-Revised ("PCL-

R") and the Structured Risk Assessment-Forensic Version ("SRA-FV"). (North Report at Bates 1614 [Ex. 3]).

During the clinical interview Respondent that he performed oral sex on the 2003 offense victim. Respondent also claimed that he had a prior sexual relationship with the victim (North Report at Bates 1633 [Ex. 3]), an assertion the victim denied (Tr. at [Ex. 13]). Respondent further stated that from October 11, 2000, until July 12, 2013, he consumed alcohol while in the community. Additionally, Respondent told Dr. North that during the period he was in sex offender therapy but did not believe that he had a sexual problem or that he needed sex offender treatment. (North Report at Bates 1633 [Ex. 3]). Respondent's interview with Dr. North also revealed that Respondent struggles with feelings of inferiority and inadequacy towards women. (North Report at Bates 1633 [Ex. 3]). Respondent further told Dr. North that he does not have a drinking problem and that respondent believed that he could remain sober even if he did not attend alcohol anonymous meetings.

Dr. North opined in his report (North Report at Bates 1614-20 [Ex. 3]) and testified at the hearing that Respondent had previously committed or attempted to engage in sexually violent conduct or child molestation.

Using the Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition ("DSM-5"), Dr. North diagnosed Respondent with Alcohol Use Disorder, Severe, in a controlled environment.

17

According to the DSM-5, the generally accepted guide used by mental health clinicians to describe and classify mental disorders, an individual meets the diagnostic criteria for Alcohol Use Disorder where there is "a problematic pattern of alcohol use leading to clinically significant impairment or distress," that occurs within a 12-month period if at least 2 of 11 criteria are met. (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition (2013)).[2] Because Respondent's

---

[2]  The 11 criteria are:
   1.  Alcohol is often taken in larger amounts or over a longer period than was intended,
   2.  There is a persistent desire or unsuccessful efforts to cut down or control alcohol use,
   3.  A great deal of time is spent in activities necessary to obtain alcohol, use alcohol, or recover from its effects,
   4.  Craving or a strong desire or urge to use alcohol,
   5.  Recurrent alcohol use resulting in a failure to fulfill major role obligations at work, school, or home,
   6. Continued alcohol use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of alcohol,
   7. Important social, occupational, or recreational activities are given up or reduced because of alcohol use,
   8.  Recurrent alcohol use in situations in which it is physically hazardous,
   9. Alcohol use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by alcohol,
   10. Tolerance, as defined by either of the following:
        a)  A need for markedly increased amounts of alcohol to achieve intoxication or desired effect,
        b) A markedly diminished effect with continued use of the same amount of alcohol, and
   11. Withdrawal, as manifested by either of the following:
        a)  The characteristic withdrawal syndrome for alcohol,
        b)  Alcohol is taken to relieve or avoid withdrawal symptoms.

access is limited his alcohol use disorder is in a controlled environment. (North Report at Bates 1636-37 [Ex. 3]).

Dr. North based his diagnosis on Respondent's well documented use of alcohol as a child which developed into a serious addiction that caused Respondent's admittance into North Dakota State Hospital 11 times prior to his 26th birthday, Respondent's 20 alcohol-related arrests of which 3 were related to his sexual offending, lack of independence, and lack of stable community ties due to his alcohol consumption. (North Report at Bates 1637 [Ex. 3]). Dr. North noted that Respondent's life "has essentially revolved around drinking, getting in trouble while intoxicated, and serving time in custody." (North Report at Bates 1637 [Ex. 3]).

Dr. North also diagnosed Respondent with sever Inhalant Use Disorder by history based on Respondent's use of inhalants (gasoline, glue, and paint thinners) from an early age. (North Report at Bates 1637 [Ex. 3]). As a result of Respondent's chronic inhalant use, Respondent has apparently suffered organic brain damage with lasting effects. (North Report at Bates 1637 [Ex. 3]). Dr. North further opined in his report (North Report at Bates 1637 [Ex. 3]) and testimony that Respondent's severe inhalant use

_____

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders - Fifth Edition (2013).

has stunted Respondent's social, emotional, and sexual development to the extent that he ceased developing mentally and emotionally when he was 12-13 years old.

Dr. North also found that a diagnosis of Mild Neurocognitive Disorder is also warranted based on Respondent's inhalant use and possible combination with his alcohol usage, which has resulted in a decline in his level of functioning in one or more cognitive domains and is evident by Respondent's disorganized thinking, loose associations, and problems with language and verbal expression Respondent demonstrated during the clinical interview. (North Report at Bates 1637-38 [Ex. 3]).

Dr. North also opined that Respondent's alcohol abuse disorder was a serious mental illness, abnormality, or disorder and as and that as a result of the disorder Respondent would have serious difficulty refraining from engaging in sexually violent conduct a child molestation if released.

Dr. North concurred with Dr. Ross's scoring on the Static-99R, an actuarial instrument used to examine static factors that impact an individual's risk of reoffending, except on Item 2, which asks whether an individual has cohabited with an intimate partner for two years or more. (North Report at Bates 1639-40 [Ex. 3]). Whereas Dr. Ross assigned no points for that item, Dr. North determined that one point should be assessed, which resulted in a

total score of 5 and placed Respondent in the above average risk category. (North Report at Bates 1639 [Ex. 3]).

Dr. North use the SRA-FV to review additional relevant risk factors. (North report at Bates 1639-40 [Ex. 3]). Dr. North found that Respondent showed evidence of intimacy deficits cited in support of that respondent's belief that marriage is frightening to him. (North report at Bates 1639 [Ex. 3]). Further that Respondent shows significant social deviance (unstable lifestyle) and poor problem-solving skills based on Respondent's denial that he has an alcohol consumption problem. (North Report at Bates 1639-40 [Ex. 3]). Using the routine sample of the comparable offenders Dr. North determined that 15% of offenders in the routine sample with a the Static-99R score of five re-offended within five years of release from custody. (North report at Bates 1640 [Ex. 3]). Dr. North noted in his report, however, that he believed that this underestimates the actual recidivism rate since many sex offenders commit undetected and unreported offenses.

Dr. North reasoned that Respondent's severe alcohol abuse disorder made him "prone to sexual assault females when he's under the influence." (North Report at Bates 1639 [Ex. 3]). Further, that Respondent did not consider himself an alcoholic and believed that he could stay away from alcohol without any kind of program or support the community. (North Report at Bates 1639 [Ex. 3]).

21

Dr. North also scored Respondent on the PCL-R to ascertain the presence of psychopathy. (North report at Bates 1640-41 [Ex. 3]). Respondent obtained an overall score of 19 which placed him within the moderate range of psychopathy.

Dr. North cited in his report and his testimony that the greatest dynamic factor in his analysis of Respondent's sexual dangerousness was Respondent's denial that he was an alcoholic.

Dr. North also examined protective factors that could potentially lessen Respondent's sexual dangerousness. The three protective risk factors are (1) having been in community for 10 years without committing a sexual offense, (2) having less than 15 years left to live due to an illness or physical problem or condition that would decrease libido, mobility, or motivation to reoffend, and (3) very advanced age. (North Report at Bates 1641 [Ex. 3]). Dr. North testified that none of these protective factors were applicable to Respondent. Respondent is 57 years old and does not suffer from any physical or medical problems that myself to decrease his ability sexually reoffend. Moreover, his age has affected his actuarial score. Further, that Respondent has not been released into the community since his last sex offense.

Dr. North also squarely addressed Respondent's institutional compliance. Dr. North testified that the record showed that after Respondent's conviction 1982 he was imprisoned and that

correctional officials considered Respondent a model inmate and that upon Respondent's release he consumed alcohol and sexually re-offended. Dr. North further testified that Respondent's history demonstrates that when he is confined to a structured environment such as a prison Respondent will conform his behavior and not act out.

### 3. Dr. Heather Ross

Dr. Heather Ross is a BOP forensic psychologist. Dr. Ross prepared the precertification report for the Certification Review Branch Panel's consideration on whether to issue a certificate stating Respondent was a sexually dangerous person. (Ross Report [Ex. 5]). Respondent declined to submit to an interview with Dr. Ross. (Ross Report at Bates 528 [Ex. 5]). Dr. Ross reviewed court documents, BOP psychological records, and other documentation. (Ross Report at Bates 529 [Ex. 5]). Additionally, Dr. Ross also reviewed updated BOP reports including Dr. Holden's clinical notes and initial treatment plan and testing report.

Dr. Ross opined that Respondent meets the criteria for civil commitment as a sexually dangerous person. (Ross Report at Bates 545 [Ex. 5]).

Dr. Ross found that Respondent met criteria for prong one of the Adam Walsh Act based on his criminal history, including the 1987 offense. (Ross Report at Bates 535-39 [Ex. 5]).

Dr. Ross diagnosed Respondent with Alcohol Use Disorder, in a controlled environment; Inhalant Use Disorder, in sustained remission; Adult Sexual Abuse by Nonspouse or Non-Partner (perpetrator); and Child Sexual Abuse (perpetrator). (Ross Report at Bates 540-41 [Ex. 5]).

Dr. Ross diagnostic impressions supporting Prong Two are contained in her report (Ross Report at Bates 540-41 [Ex. 5]) and she testified that she concurred with Dr. North regarding the basis for a finding that Respondent suffered from alcohol use disorder. Dr. Ross testified that this diagnosis constituted a serious mental illness, abnormality, or disorder under the Adam Walsh Act.

Dr. Ross testified that her findings Adult Sexual Abuse by Nonspouse or Non-Partner and Child Sexual Abuse diagnosis did not factor in her analysis regarding whether Respondent would have serious difficulty in refraining from engaging in sexually violent conduct or child molestation.

Dr. Ross opined in her report that Respondent would have serious difficulty refraining from sexually violent conduct or child molestation if released based on Respondent's "overuse of alcohol," which exacerbated Respondent's impulsiveness. (Ross Report at Bates 545 [Ex. 5]). Dr. Ross's report cites Respondent's lack of familiar social support as evidenced by the exclusionary order issued by his tribe that forbade him from returning to the reservation and the letter Respondent's family wrote to the United

24

States Probation Office in 2014 stating that they feared his release from imprisonment that they did not want him to return to the community. (Ross Report at Bates 539 [Ex. 5]; July 8, 2014 letter [Ex. 8]). Moreover, Dr. Ross testified that Respondent did not have in place a concrete relapse prevention plan.

Dr. Ross also analyzed static and dynamic factors are relevant to respondent's risk of reoffending. Dr. Ross noted that Respondent's score of 4 on the Static-99R placed Respondent in the moderate-high risk category (Ross Report at Bates 542 [Ex. 5]). Dr. Ross testified that her score was different than that of the other examiners who utilized the Static-99R and found a score of five based on Risk Factor 2 (whether Respondent ever lived with a partner for two years) because records do not provide sufficient information and respondent declined to be interviewed during the precertification Report process. Dr. Ross testified that based on her review of the other experts' reports and Respondent's deposition she would now assess an additional point which would bring Respondent's total score to 5 on the instrument. Dr. Ross testified that the static factors did not adequately represent Respondent's risk of sexual reoffending because the dynamic risk factors were so significant.

To more accurately determine Respondent's risk, Dr. Ross also examined dynamic risk factors and found that Respondent's poor problem-solving, lifestyle impulsivity (alcohol use, low self-

25

control, irresponsible decisions), resistance to rules with vision, and lack of emotionally intimate relationships with adults were the most relevant dynamic risk factors applicable to Respondent's risk of reoffending sexually. (Ross Report at Bates 543-44 [Ex. 5]).

Dr. Ross also considered federal regulations relevant to determining sexual dangerousness. (Ross Report at Bates 544-45 [Ex. 5]). Dr. Ross testified that updated information contained in Dr. Holden's clinical notes revealed that Respondent did not appreciate the wrongfulness of his conduct because he minimizes, justifies, and blames others.

Dr. Ross also testified that the other relevant BOP factors in Respondent's case were Respondent's inability to control his conduct and his lack of successful completion in sex offender treatment. Regarding sex offender treatment, Dr. Ross testified that she was aware that Respondent was now in sex offender treatment in the CTP but that Respondent was still minimizing and denying his offenses. Dr. Ross opined that in addition to sex offender treatment she believed Respondent needed to successfully complete substance abuse treatment and that Respondent continued to deny that he had an alcohol problem.

Dr. Ross opined in her report and testified that Respondent's inability to control his conduct while under supervision was an important fact because he committed three sexual offenses (the

26

1982, 1988, and 2003 offenses) while he was likely to be caught. (Ross Report at Bates 544-45 [Ex. 5]). Additionally, that based on Dr. Zinik's clinical interview with Respondent, Respondent committed the 1987 offense while likely to be caught since the victim met Respondent the night before the attempted rape. Dr. Ross further testified that Respondent's Static-99R score was reflective of an individual in the moderate-high range of sexual offense.

Dr. Ross also considered protective factors. (Ross Report at Bates 531 [Ex. 5]). Dr. Ross noted in her report that the protective factors i.e. age, medical factors, and time and community were not applicable in Respondent's case in that there is no evidence that respondent could not perform sexually at his age and that age was already factored into the Static-99R score. (Ross Report at Bates 531 [Ex. 5]). Additionally, there was no evidence that Respondent suffered from any medical limitations that could minimize his ability to perform sexually or reoffend. (Ross Report at Bates 531 [Ex. 5]).

Moreover, Respondent had not spent significant time in the community offense free and being on supervision has not acted as a deterrent that prevented him from committing crimes. (Ross Report at Bates 531 [Ex. 5]). Dr. Ross testified that Respondent's two-year term of supervised release would not lessen his sexual

27

dangerousness in that Respondent has re-offended while on supervision.

Dr. Ross also testified that a well-developed release prevention plan would be beneficial but that based on her review of Respondent's deposition Respondent merely intended to do the same thing he did when he was released previously except that this time Respondent stated he would leave alcohol alone. Dr. Ross found that this was not a concrete and well-developed alcohol release plan because it relied on Respondent's hopes that he could avoid alcohol.

Dr. Ross further testified that although strong community support would benefit Respondent if he were released, Respondent had no community support as evidenced by the fact that his tribe forbade him from returning and that his family disowned him.

Dr. Ross also considered Respondent's institutional behavior and noted that while institutionalized a structured environment Respondent behaved appropriately. This factor, however, did not lessen Respondent sexual dangerousness in that Respondent Peter Lee re-offended upon release from imprisonment and when is no longer in a highly structured environment.

Dr. Ross also considered Respondent's numerous nonsexual offenses that Respondent committed while intoxicated and whether that demonstrated Respondent exhibited volitional control. Dr. Ross found that Respondent's nonsexual offenses did not indicate

28

that he was less sexually dangerous because Respondent had committed for sexual offenses while highly intoxicated and that Respondent's 2003 offense demonstrated the pace of Respondent's sexual offending have increased.

### 4. Dr. Gary Zinik

Like Dr. North, Dr. Zinik also opined that Respondent meets the criteria for civil commitment as a sexually dangerous person. (Zinik Report at Bates 1670-71 [Ex. 7]). Dr. Zinik conducted a record review, interviewed Respondent on February 18, 2016, and conducted an analysis of static and dynamic risk factors that potentially exacerbated Respondent's risk of reoffending sexually and protective factors that potentially lessened his risk of reoffending. Additionally, Dr. Zinik reviewed Dr. Holden's clinical notes and initial treatment plan and testing report which were also submitted in evidence as Exhibits 24 and 26-27.

Respondent with told Dr. Zinik during the clinical interview that he was not related to the 2003 victim. (Zinik Report at Bates 1661 [Ex. 7]). Respondent denied that he grabbed the 2003 victim and attempted to sexually assault her. Respondent admitted that he performed cunnilingus on the victim but claimed that he had done so in the past and it was consensual. Respondent denied that he had a sexual problem and stated that his problems were drinking and drugs, with alcohol being his drug of choice. Respondent also stated that he was aroused sexually while drunk and felt that it

29

was normal and that there was nothing wrong with it. (Zinik Report at Bates 1661-62 [Ex. 7]).

Regarding Respondent substance abuse problems, Respondent told Dr. Zinik that he believed that he could leave alcohol alone and could control himself. (Zinik Report at Bates 1662 [Ex. 7]).

Like Dr. North, Dr. Zinik determined that Respondent had previously committed or attempted to engage in sexually violent conduct or child molestation based on his sexually violent conduct in 1982, 1987-88, and 2003. (Zinik Report at Bates 1644-55, 1668 [Ex. 7]).

Like Dr. North, Dr. Zinik also diagnosed Respondent with Alcohol Use Disorder, Severe, in a controlled environment; Inhalent Use Disorder, Severe, in sustained remission; and Inhalent-induced Mild Neurocognitive Disorder.

Dr. Zinik described alcohol as Respondent's drug of choice and most persistent addiction. Dr. Zinik testified that Respondent had consistently denied that Respondent had an alcohol problem. In addition to the reasons cited in his report (Bates 1663 [Ex. 7]), Dr. Zinik agreed with the testimonies of Drs. North and Ross regarding Respondent's alcohol dependence.

Likewise, in addition to the reasons cited in his report (Bates 1663 [Ex. 7]), Dr. Zinik agreed with the testimonies of Drs. North and Ross regarding their basis for finding that Respondent also qualified for a diagnosis of inhalant use disorder.

30

Dr. Zinik also found that Respondent met criteria for diagnosis of Mild Neurocognitive Disorder based on years of inhalant use that was likely compounded by Respondent's alcohol use. (Zinik report at Bates 1663-64 [Exhibit 7]).

Additionally, Dr. Zinik opined in his report and testified that a diagnosis of inhalant-induced mild neurocognitive disorder was warranted based on Respondent's inhalant and alcohol use which resulted in a decline from Respondent's previous level of functioning in one or more cognitive domains as evidenced by Respondent's disorganized thinking, loose associations, and problems with verbal expression and language. (Zinik report at Bates 1664 [Exhibit 7]). Dr. Zinik also testified that he determined the disorder was "mild" because Respondent's cognitive deficits do not appear to interfere with Respondent's daily living activities.

Additionally, Dr. Zinik diagnosed Respondent with Other Specified Personality Disorder with Schizotypal and Schizoid Features. (Zinik Report at Bates 1664-65 [Ex. 7]). According to the Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition ("DSM-5"), personality disorders are characterized by an enduring pattern of inner experience and behavior that begins at the onset of adolescence or early adulthood and stabilizes over time, and deviates decidedly from an individual's culture, is pervasive and inflexible, and leads to distress and impairment.

31

If all the criteria for one personality disorder are not met or combined features of one or more personality disorder are prominent then a diagnosis of other personality disorder is warranted. (Zinik Report at Bates 1664 [Ex. 7]).

"Schizotypal Personality Disorder is characterized by social and interpersonal deficits that that result in acute discomfort with, and reduced capacity for, close relationships." (Zinik Report at Bates 1664 [Ex. 7]). An individual suffering from schizotypal personality disorder experiences cognitive and perceptual distortions and exhibits eccentric behavior. (Zinik Report at Bates 1664 [Ex. 7]). They also are unable to form emotional attachments with others or sustain relationships due to a belief that others harbor them ill will. Particularly relevant here, some individuals, like Respondent, demonstrate strange speech mannerisms and beliefs. Further, they might react abnormally in conversations, not respond, or even talk to themselves. They may also misinterpret situations as having unusual meanings to them or hold superstitious beliefs or believe in the paranormal. (Zinik Report at Bates 1664 [Ex. 7]).

Schizoid Personality Disorder is a mental disorder that is characterized by a pervasive pattern of detachment from social relationships and restricted range of expression of emotions in interpersonal situations. Individuals suffering from schizoid personality disorder tend to be loners, secretive, display

32

emotional coldness and are apathetic. (Zinik Report at Bates 1664 [Ex. 7]).

Respondent demonstrates a mixed personality disorder that includes both schizotypal and schizoid features. (Zinik Report at Bates 1665 [Ex. 7]). Dr. Zinik opined his report and testified that the schizotypal features Respondent displayed include odd beliefs, unusual perceptions, odd thinking, suspicious and paranoid behavior, inappropriate affect, lack of close friends, and excessive social anxiety. Dr. Zinik also opined his report and testified that the schizoid features Respondent displayed include Respondent's solitary behavior, lack of pleasure in few social activities, emotional coldness, detachment, and Respondent's demonstrated lack of interest in sexual experience with others.

Dr. Zinik testified that although Respondent engaged in solitary behavior and also demonstrated little interest in sexual experience with others it did not lessen his sexual dangerousness because the record demonstrates that Respondent has been a loner all his life yet he committed four sexual offenses.

Further, Respondent is not asexual. Respondent is afraid and embarrassed about sex. He still becomes sexually aroused and is anxious. Respondent is sexually attracted to women but is unable to control and manage his sexual feelings, particularly when he is

33

under the influence of alcohol. (Zinik Report at Bates 1665 [Ex. 7]).

Dr. Zinik opined in his report and testimony that based on the interplay of Respondent's various serious mental illnesses, abnormalities, or disorders Respondent would have seriously difficulty in refraining from engaging in sexually violent conduct or child molestation. This is due to his alcoholism and sexual arousal which coupled with Respondent's organic dysfunction and schizotypal and schizoid features prevents Respondent from understanding and coping with his arousal. Consequently, Respondent is overwhelmed and acts impulsively resulting in his sexual offending.

Dr. Zinik utilized the Static-99R to determine static risk factors and determined that Respondent scored a 5 which fell in the above average score on the instrument. (Zinik Report at Bates 1667, 1672 [Ex. 7]). Dr. Zinik testified that the static score did not adequately represent Respondent's risk of sexual recidivism based on Respondent's alcoholism and failure to complete both substance abuse and sex offender treatment. (Zinik Report at Bates 1669 [Ex. 7]).

In order to better assess Respondent's risk of reoffending Dr. Zinik administered the Sexual Violence Risk – 20, an instrument that measures 20 risk factors for offenders who have been convicted or alleged to have committed a sexual offense with moderate

34

predictive accuracy. (Zinik Report at Bates 1665 [Ex. 7]). Dr. Zinik found that Respondent met 15 of 20 risk factors which placed him in the high risk category. (Zinik Report at Bates 1667, 1673 [Ex. 7]). Dr. Zinik opined in his report and testimony that these factors include Respondent's lack of emotional intimate relationships with adults, lifestyle impulsiveness, poor problem solving skills, and poor cooperation with rules and supervision. (Zinik Report at Bates 1667, 1673 [Ex. 7]).

Dr. Zinik testified that he also considered federal regulations used to determine sexual dangerousness. (Zinik Report at Bates 1668 [Ex. 7]). Dr. Zinik found that a number of these factors were met, as evidenced by Respondent's inability to control his conduct while on supervised release and living in a supportive environment and participating in sex offender treatment and substance abuse treatment. Further, that Respondent committed his offense while likely to get caught in that all his victims knew him because they were related to him (the 1982, 1988, and the 2003 offenses) or met him the night before (the 1987 offense).

Dr. Zinik also considered Respondent's admissions that during the 1988 rape he felt a loss of control and Respondent statement that during the 2003 attempted rape, which Respondent pleaded guilty but mentally ill to sexual contact with a person incapable of consenting (Amended Judgment [Exhibit 11]), that he was out of

35

control.    Additionally,  Dr.  Zinik  considered  Respondent's statement to Dr. Holden that Respondent was sexually dangerous.

Dr. Zinik, who also still treats sex offenders as part of his  practice,  also  testified  that  he  concurred  with  Dr.  Holden that it would be detrimental to Respondent's treatment if the court were to effectively remove Respondent from treatment at this time because  it  takes  time  to  form  relationships  between  patients  and treatment providers.  Dr. Zinik further testified that he believes Respondent  needs  substance  abuse  treatment  in  addition  to  sex offender treatment and that Respondent's denial that he has alcohol problems  impacts  Respondent's  ability  to  successfully  complete substance abuse treatment.

Lastly  Dr.  Zinik  Testified  That  he  reviewed  Respondent's institutional   behavior,   his   general   offense   history,   and protective   factors   that   will   reduce   respondent's   risk   of reoffending sexually.

Dr. Zinik acknowledged that Respondent did not have a history of acting out while institutionalized but that such a history did not  render  Respondent  less  sexually  dangerous  because  each  time Respondent  was  released  into  the  community  from  a  structured environment Respondent consumed alcohol and committed both general and four sexual offenses.

Dr. Zinik testified that he examined protective factors that would  reduce  Respondent's  risk  of  sexual  reoffending.   These

36

factors included age and health. (Zinik Report at Bates 1667-68 [Ex. 7]). Dr. Zinik found that these factors would not reduce Respondent's risk of reoffending because Respondent is in physically good health, has not lived in the community for a significant period of time without reoffending, and although he is older he still has an active sexual drive.

Finally, Dr. Zinik testified that although he did not find the presence of a paraphilia it did not render respondent less sexually dangerous. Dr. Zinik opined that Respondent's alcohol abuse disorder and other specified personality disorders with schizotypal and schizoid features would cause Respondent to have serious difficulty in refraining from engaging in sex he found conduct or child molestation if released.

### 5. Respondent Blake Charboneau

Respondent testified in his own behalf. Respondent testified that he is 57 years old and grew up on a reservation. He is Catholic and attends a weekly Bible study group held in the BOP.

Respondent testified that he committed sexual offenses in 1982, 1987, 1988, 2003 while under the influence of alcohol. Respondent also testified that he understood what the term "sexually dangerous" meant and but that he does not think that he is sexually dangerous.

Respondent testified that he began attending AA meetings in March 2016 of his own volition. Respondent also testified that he

37

was "powerless" when it came to alcohol, but that he would not consume alcohol if released. Respondent also testified that he was aware of the presence of alcohol in prison but had no desire to drink. On cross-examination, however, Respondent admitted that he had not seen alcohol in the Maryland unit.

Respondent also testified that excepting one minor infraction during his 13 years of incarceration Respondent has conformed to prison rules and regulations. On cross-examination Respondent agreed that he was also considered a model prisoner after he was incarcerated upon his 1982 conviction but upon his release he later went on to commit other sexual offenses. Respondent further testified that he committed his most recent offense while on supervision and enrolled in sex offender treatment. Regarding sex offender treatment, Respondent admitted that prior to the 2003 sexual offense Respondent intended to quit sex offender treatment.

**6. Dr. Joseph J. Plaud**

Respondent called Dr. Plaud to testify on Respondent's behalf. Like Drs. North, Ross, and Zinik before him, Dr. Plaud testified that he found that Prong One had been met based on Respondent's 1982, 1987, 1988, and 2003 sexual offenses. Dr. Plaud testified that the uncharged 1987 offense was qualitatively different than Respondent's 2003 conviction, which Dr. Plaud described as like a "statutory offense" since Respondent pleaded guilty to sexual contact with a person incapable of consenting.

(Am. Judgment [Ex. 11]). Like Drs. North, Ross, and Zinik, Dr. Plaud opined that Respondent met the diagnostic criteria under the DSM-V for Alcohol Use Disorder, severe, in a controlled environment and Inhalant Use Disorder, severe, in a sustained remission. Unlike Drs. North, Ross, and Zinik, however, Dr. Plaud found that alcohol use disorder in respondent's case did not qualify as a serious mental illness, abnormality, or disorder under the Adam Walsh Act. This is so Dr. Plaud reasoned because alcohol use disorder is not a paraphilic disorder or a personality disorder. (Plaud Report at Resp. 2-3 [Rep't Ex. 2]).

Further, Dr. Plaud appeared reluctant during his testimony to state that alcohol abuse disorder standing alone could qualify for a serious mental illness, abnormality, or disorder. However, eventually Dr. Plaud testified that single diagnosis of alcohol abuse disorder could qualify as a serious mental illness, abnormality, or disorder but that he would have expected more instances of alcohol-fueled sexual crimes.

Dr. Plaud also found that Prong Three was not met. In support of his conclusion Dr. Plaud cited the absence of a sexually-based paraphilia personality disorder and also reasoned that because Respondent is approaching 60 years old he closely aligns with a comparable group of offenders whose risk of sexual offending is reduced. (Plaud Report at Resp. 2-3 [Rep't Ex. 2]).

39

Dr. Plaud conducted a statistical risk analysis by scoring Responded on the Static-99R. (Plaud Report at Resp. 15-16 [Rep't Ex. 2]). Dr. Plaud determined that Respondent scored a five on the instrument and using the routine sample of comparable offenders determined that individuals in that group had a 15.2% chance of sexual re-offending within a five-year period. (Plaud Report at Resp. 16 [Rep't Ex. 2]).

Dr. Plaud also performed additional testing. Dr. Plaud utilized an objective psychological personality screening inventory assessment, the IPDE, to assess the presence of personality disorders. (Plaud Report at Resp. 16-17 [Rep't Ex. 2]). Although the results of the screening questionnaire indicated no major cause of personality disorder, Dr. Plaud found that there was evidence of schizoid and histrionic personality disorders. (Plaud Report at Resp. 16-17 [Rep't Ex. 2]).

Dr. Plaud disagreed with the significance of the dynamic factors such as poor problem-solving and compliance with supervision cited by Drs. North, Ross, and Zinik, although he acknowledged that multiple dynamic factors were present.

Dr. Plaud also found that Respondent displayed excellent general and sexual behavioral control during his incarceration. (Plaud Report at Resp. 4 [Rep't Ex. 2]). During cross-examination, however, Dr. Plaud conceded that a review of Respondent's institutional behavior demonstrated that while incarcerated and in

40

a structured environment Respondent complied with rules and regulations but when released into the community and in a least structured environment he consumed alcohol and sexually offended. Dr. Plaud also acknowledged that although prison made alcohol is available, a review of Respondent's deposition testimony (Charboneau Dep. 42:18-51:19) revealed that Respondent did not have ready access to prison made alcohol.

Further, Dr. Plaud noted in his report that given Respondent's history there is some probability that Respondent will abuse alcohol if released. (Plaud Report at Resp. 4 [Rep't Ex. 2]). Relatedly, Dr. Plaud testified that if Respondent drank Respondent would become drunk and if drunk Respondent would commit alcohol-related offenses as he has done in the past that include public intoxication and acting disorderly while intoxicated. Dr. Plaud, testified, however, that he did not believe Respondent would commit a sexual crime.

Dr. Plaud also cited Respondent's attendance at AA meetings as positive and believed that Respondent's remaining two-year term of supervised release as also helpful. Regarding Respondent's enrollment in sex offender treatment between 2000-2003, Dr. Plaud appeared to testify that Respondent was not of a mindset back then to benefit from the treatment.

With regard to Respondent's participation in the CTP and the importance of maintaining the therapeutic alliance between Dr.

Holden and Respondent, Dr. Plaud testified that Respondent could receive adequate out-patient sex offender treatment.

With regard to Dr. Holden's testimony that Respondent told her that he was sexually dangerous, Dr. Plaud testified that Respondent tended to agree with whatever is placed before him and because CTP is a sex offender treatment program for sexually dangerous persons Respondent merely adopted the belief that Respondent was sexually dangerous.

### CONCLUSIONS OF LAW

Petitioner seeks the commitment of Respondent pursuant to the Adam Walsh Child Protection and Safety Act of 2006, codified at 18 U.S.C. §§ 4247-48. Petitioner may seek the civil commitment of certain individuals in the custody of the Federal Bureau of Prisons who are determined to be "sexually dangerous person[s]." 18 U.S.C. § 4248(d). To demonstrate that an individual should be civilly committed under § 4248, Petitioner must prove, by clear and convincing evidence, that each one of the following: (1) Respondent has previously "engaged or attempted to engage in sexually violent conduct or child molestation" (the "prior conduct" element), 18 U.S.C. § 4247(a)(5); (2) Respondent currently "suffers from a serious mental illness, abnormality, or disorder" (the "serious illness" element), id. § 4247(a)(6); and (3) as a result of such a condition, Respondent "would have serious difficulty in refraining from sexually violent conduct or child molestation if

42

released" (the "serious difficulty" or "volitional impairment"
element), id. See also United States v. Springer, 715 F.3d 535,
538 (4th Cir. 2013).

For the reasons that follow, the Court finds that Petitioner
has met its burden by clear and convincing evidence and therefore
orders Respondent committed to the custody of the Attorney General.

### A. Respondent Has Engaged in or Attempted to Engage in Sexually Violent Conduct or Child Molestation.

The Court finds that Petitioner has established by clear and
convincing evidence that Respondent has engaged in or attempted to
engage in sexually violent conduct or child molestation in the
past. Drs. North, Ross, Zinik, and Respondent's selected mental
health examiner, Dr. Plaud, all concluded that this prong is
satisfied based on Respondent's 1982, 1988, and 2003 convictions
and the 1987 uncharged attempted rape. Additionally, Respondent
admitted during his testimony that he attempted to rape the victim
in the uncharged 1987 offense.

### B. Respondent suffers from a serious mental illness, abnormality, or disorder

The Court also finds that Petitioner has established by clear
and convincing evidence that Respondent suffers from a serious
mental illness, abnormality or disorder.

Petitioner presented the testimony of Drs. North, Ross, and
Zink to establish that Respondent suffers from a serious mental
illness, abnormality or disorder. The Court credits the testimony

43

of Drs. North, Ross, Zinik that Respondent suffers from Alcohol Use Disorder, Severe, in a controlled environment; Inhalent Use Disorder, Severe, in sustained remission; and Inhalent-induced Mild Neurocognitive Disorder. The Court also credits the testimony of Dr. Zinik that Respondent suffers from Other Specified Personality Disorder with Schizotypal and Schizoid Features.

The Court finds that alcohol use disorder, severe, in a controlled environment is a serious mental illness, abnormality, or disorder in Respondent's case. The Court finds the opinions of Drs. North, Ross, and Zinik that Respondent's alcohol use disorder, severe, in a controlled environment qualifies as a serious mental illness, abnormality, or disorder are more persuasive than Dr. Plaud testimony that in this case such a diagnosis would not qualify.

Law enforcement officers have jailed Respondent for alcohol related offenses, including public intoxication, liquor violations, and disorderly conduct repeatedly. Importantly, all the experts, including Dr. Plaud, testified that Respondent's alcohol overuse was pervasive and that he committed the sexual offenses while severely intoxicated. The overwhelming evidence demonstrates that Respondent's alcohol abuse resulted in interpersonal difficulties that included estrangement from his family and tribe. Moreover, the strength grip of the disorder was such that respondent admitted to the probation officer that during

44

the rape of his 10-year-old daughter in 1988 he lost control and during the 2003 sexual assault Respondent admitted to the investigating officers that he lost control and should not have orally copulated the victim. As such, the Court finds that alcohol abuse disorder, severe, in a controlled environment in Respondent's case is a serious mental illness, abnormality, or disorder. See United States v. Gloshay, No. 5:08-HC-2051-BR, Docket Entry 91 (E.D.N.C. June 4, 2012); Cf. United States v. Carta, 620 F.Supp. 2d 210, 228-29 (D. Mass. 2009)(finding drug and alcohol problems did not satisfy second prong of the Adam Walsh Act where the government failed to show that the respondent's substance abuse had significantly contributed to his sexual offending); see also United States v. Julius, No. 5:08-HC-2076-H, Docket Entry 59 (E.D.N.C. March 18, 2013) (declining to decide whether a personality disorder or substance dependence in combination or standing alone constituted a serious mental disorder sufficient to commit an individual under the Adam Walsh Act because even if the court assumed the government had met its burden under prong two, the government failed to establish prong three by clear and convincing evidence).

Alternatively, the Court finds Petitioner has established by clear and convincing evidence that in addition to alcohol abuse disorder, inhalant-induced mild neurocognitive disorder, and other specified personality disorder with schizotypal and schizoid

features are serious mental illnesses, abnormalities, or disorders in Respondent's case when viewed in combination with alcohol abuse disorder. The Court's finding is supported in the record and by the testimony that with respect to inhalant-induced mild neurocognitive disorder Respondent displayed expressive language difficulties and as Dr. Plaud agreed during his testimony affects Respondent's interpersonal functioning. Likewise, the evidence supports a finding that Respondent also suffers from other specified personality disorder with schizotypal and schizoid features. The Court is persuaded by Dr. Zinik's testimony and analysis on that subject. Moreover, Dr. Zinik's analysis is supported by Dr. Plaud's report. (Plaud Report at Resp. 16-17 [Rep't Ex. 2]).

### C. Serious difficulty in refraining from sexually violent conduct or child molestation if released.

Petitioners has also proved by clear and convincing evidence that Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released. The Court credits the testimony of Drs. North, Ross, and Zinik in this area. The Court also gives greater credit to the testimony of Dr. Holden over Respondent.

In order to establish this prong of the Adam Walsh Act Petitioner must establish by clear and convincing evidence that Respondent would have serious difficulty in refraining from

engaging in sexually violent conduct or child molestation if released. United States v. Perez, 752 F.3d 398, 407 (4th Cir. 2014); United States v. Antone, 742 F.3d 151, 158 (4th Cir. 2014).

The Supreme Court held in Kansas v. Crane, 534 U.S. 411 (2002), that in order to civilly commit someone for sexual dangerousness "there must be proof of serious difficult in controlling behavior." Id. at 413. The Supreme Court noted that this standard allowed courts wide discretion in relying on a number of different factors relevant to sexual dangerousness.

Some of these factors are (1) failures while on supervision; (2) resistance to treatment; (3) continued deviant thoughts; (4) cognitive distortions; (5) actuarial risk assessments; (6) impulsiveness; and (7) historical offenses, both sexual and non-sexual. United States v. Wooden, 693 F.3d 440, 458, 462 (4th Cir. 2012). A court must also fully consider and account for why a detainee's positive incarceration conduct is overshadowed by other factors that warrant a finding that the detainee would have serious difficulty from refraining from engaging in sexually violent conduct a child molestation. Antone, 742 F.3d at 164-70.

Here, the experts all testified that when housed in a secured institution, Respondent generally acts as a model prisoner. Respondent did so after this 1982 conviction and other convictions and reoffended sexually upon each release from imprisonment. Importantly, unlike the detainee in Antone, Respondent is in BOP

47

custody on a supervise release revocation for which he violated his term of supervised release while in sex offender treatment. Thus, Respondent's positive institutional conduct when considered in light of the features of the case are outweighed by other factors. One such factor is Respondent's admission in December 2016 that he was sexually dangerous.

Dr. Holden testified that Respondent admitted that he was sexually dangerous. The Court gives greater weight to Dr. Holden's disinterested testimony than that of Respondent's that he did not make such an admission. Further, the Court also credits Dr. Holden's testimony that she has developed a therapeutic alliance with Respondent and that she carefully recorded his statement. Additionally, Respondent testified that he understood what sexually dangerous meant.

Additionally, the Court is not persuaded by Dr. Plaud's testimony that although if released Respondent, based on his history, may abuse alcohol and commit many of the general crimes he has previously committed but would likely not commit a sexual offense. Therefore, the Court does not credit Dr. Plaud's opinion that Respondent does not meet the criteria for commitment. The Court gives greater weight to the opinions of Drs. North, Ross, and Zinik. Their analysis of Respondent's sexual dangerousness is more thorough, better reasoned, and better supported by the record.

48

The Court concludes that Respondent has engaged in sexually violent conduct or child molestation in the past, currently suffers from a serious mental illness, abnormality, or disorder, and as a result of a serious mental illness, abnormality or disorder, would have serious difficulty in refraining from sexually violent conduct or child molestation if released.

Respondent is therefore committed to the custody of the Attorney General under the Adam Walsh Act until such time as he is no longer a sexually dangerous person.

Respectfully submitted, this 3rd day of February 2017.

JOHN STUART BRUCE
United States Attorney


BY: /s/ Michael G. James
MICHAEL G. JAMES
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919)856-4821
Email: seth.wood@usdoj.gov
Attorney for Petitioner

CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served upon Counsel for Respondent by electronically filing the foregoing with the Clerk of Court on February 3, 2017, using the CM/ECF system to:

Katherine Shea
Assistant Federal Public Defender
P. O. Box 25967
Raleigh, NC 27611-5967


BY: /s/ Michael G. James
MICHAEL G. JAMES
Assistant United States Attorney
Civil Division
3l0 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 2760l
Telephone: (9l9) 856-4530
Facsimile: (919)856-4821
Email: seth.wood@usdoj.gov
Attorney for Petitioner